PT:TDK:AMC
F#2013R01359

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**13 M 724**

- - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

DIANA DURAND,

    Defendant.

**TO BE FILED UNDER SEAL**

COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF ARREST WARRANT

(T. 2, U.S.C.,
§§ 441a(a)(1)(A) and
441f; T. 18, U.S.C.,
§ 1001(a)(2))

- - - - - - - - - - - - - - - - - -X

EASTERN DISTRICT OF NEW YORK, SS:

  GEOFFREY FORD, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and acting as such.

  Upon information and belief, in or about and between March 2010 and October 2010, within the Eastern District of New York and elsewhere, the defendant DIANA DURAND did knowingly and willfully make, and cause to be made, contributions to Committee A, a federal campaign committee formed to receive campaign contributions for the election of Candidate A to federal office, which contributions exceeded the limitation contained in the Federal Election Campaign Act of 1971, and which violation aggregated more than $2,000 during the 2010 calendar year.

  (Title 2, United States Code, Sections 441a(a)(1) and 437g(d)(1)(A)(ii))

Upon information and belief, in or about and between March 2010 and October 2010, within the Eastern District of New York and elsewhere, the defendant DIANA DURAND did knowingly and willfully make, and cause to be made, contributions of money, aggregating more than $10,000 during the 2010 calendar year, in the names of others, to Committee A, a federal campaign committee formed to receive campaign contributions for the election of Candidate A to federal office, and to Committee B, a federal campaign committee formed to receive campaign contributions for the election of Candidate B to federal office.

(Title 2, United States Code, Sections 441f and 437(g)(d)(1)(D)(i))

Upon information and belief, on or about June 14, 2012, within the Eastern District of New York and elsewhere, the defendant DIANA DURAND did knowingly and willfully make one or more materially false, fictitious and fraudulent statements and representations, in a matter within the jurisdiction of the executive branch of the Government of the United States.

(Title 18, United States Code, Section 1001(a)(2))

The source of your deponent's information and the grounds for his belief are as follows:[1]

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

1. I am a Special Agent with the FBI and have served in that capacity for approximately six years. During that time, I have been assigned to a squad tasked with conducting investigations into the activities of individuals and criminal groups responsible for public corruption. I have participated in several long-term public corruption investigations, during the course of which I have executed search warrants and arrest warrants, reviewed and analyzed taped conversations, debriefed witnesses, including cooperating witnesses and confidential sources, and participated in undercover investigations. The information set forth in this affidavit is based upon my participation in witness interviews, a review of documentary evidence and records and discussions with other law enforcement agents. The FBI is part of the United States Department of Justice and constitutes an agency within the executive branch of the Government of the United States.

## INTRODUCTION

### A. Federal Campaign Finance Law

2. The Federal Election Campaign Act of 1971, as amended, codified as Title 2, United States Code, Sections 431 through 455 (the "Election Act"), regulated financial activity intended to influence the election of candidates for federal office. In order to limit the influence that any one person could have on the outcome of a federal election, the Election Act

established limits on the amounts individuals could contribute to an individual candidate's political campaign committee. Specifically, Section 441a of the Election Act set limits on the amount of money any person may contribute to a particular campaign committee.

3. To promote transparency and prevent individuals from circumventing these regulations, the Election Act prohibited a person from making a political contribution in the name of another person, including giving funds to a "straw donor," or conduit, for the purpose of having the straw donor pass the funds on to a federal candidate as her or his own contribution. Specifically, Section 441f of the Election Act prohibited a contributor from contributing to a congressional campaign in the name of another person.

4. The Federal Election Commission ("FEC") was an agency and department of the United States with jurisdiction to enforce the limits and prohibitions of the Election Act. In order to deter abuses and instill public confidence in the election process, the FEC was and is responsible for making available to the public specific information about the amounts and sources of political contributions to federal candidates and their political committees.

5. Pursuant to the Election Act, the FEC required campaign committees, such as Committee A and Committee B, to file

periodic reports of receipts and disbursements, identifying, among other things, each person who made a contribution to such committee during the relevant reporting period whose contribution or contributions had an aggregate amount or value in excess of $200 within the calendar year, together with the date and the amount of any such contribution. In preparing these reports, federal candidates and political committees relied on the information provided by the donor, including the donor's name, address, and occupation. These periodic reports, which were filed with the FEC and made publicly available, were intended to provide citizens with a transparent record of all contributions to candidates for federal office.

6. In 2010, the Election Act limited both primary and general election campaign contributions to $2,400, resulting in an overall limit of $4,800 in contributions that any person could contribute to any one candidate during the 2010 election cycle.

B. **Committee A**

7. In 2010, Committee A was a federal campaign committee formed to receive campaign contributions for the election of Candidate A, a individual running for a congressional seat representing a district located in the Eastern District of New York.

8. Committee A's bank account, into which contributions to Committee A were deposited, was maintained at a

6

bank located in the Eastern District of New York. Committee A's address was also located in the Eastern District of New York.

### C. DIANA DURAND

9. The defendant DIANA DURAND was a personal friend of Candidate A. In 2009 and 2010, DURAND engaged in fundraising efforts in support of Candidate A's campaign for election to Congress in 2010, including hosting and organizing a November 2009 "meet and greet" event where DURAND invited individuals to meet Candidate A and contribute to Committee A.

10. In November 2009, DURAND donated $4,800 to Committee A, the maximum allowable amount that any individual was permitted to donate to Committee A for the 2010 election cycle.

11. At the time of her November 2009 donation of $4,800, DURAND was aware that she was not permitted to make further monetary contributions to Committee A. In a November 2009 email soliciting contributions to Committee A, DURAND stated to two acquaintances that "the max you can donate is 4800.00 and after that you can't give a dime, so believe me if I could give more than that so I wouldn't have to ask everyone for help thats [sic] what I would do . . . ."

## OFFENSE CONDUCT

12.     In or about the spring of 2012, fellow FBI agents and I were investigating whether violations of the Election Act had occurred in connection with Committee A.  Specifically, the investigation concerned whether individuals had circumvented contribution limits by funneling contributions through straw donors who were reimbursed for their donations, in violation of Sections 441a(a) and 441f of the Election Act.

13.     As part of this investigation, the FBI conducted a number of interviews.  On or about June 12, 2012, I, along with a fellow FBI Special Agent, conducted an interview of Donor A, an individual who had contributed $4,800 to Committee A in November 2009.  During this interview, Donor A stated that s/he made this contribution at DURAND's request after DURAND promised to reimburse her/him for the full $4,800 amount by agreeing to rent a vacation property owned by Donor A, the cost of which would have roughly equaled the amount of the donation.  Donor A further stated that DURAND never rented her/his vacation property following her/his donation and that DURAND never reimbursed Donor A in any other manner.

14.     Following the interview with Donor A, Donor A and Donor A's spouse spoke to DURAND over the telephone and told her that they had been visited by the FBI and that the FBI

questioned them concerning the donation Donor A made to Committee A at DURAND's request.

15. On or about June 14, 2012, I, along with a fellow FBI Special Agent, conducted an interview of Straw Donor #1, an individual who had contributed $4,800 to Committee A in March 2010 using her/his credit card.[2] During this interview, Straw Donor #1 stated that s/he made this contribution at DURAND's request after DURAND promised to reimburse her/him for the full amount. Straw Donor #1 also stated that s/he would not have made the contribution had DURAND not promised to reimburse her/him. Straw Donor #1 further stated that DURAND had in fact reimbursed her/him by issuing Straw Donor #1 a check for $4,800 shortly after Straw Donor #1 had made a contribution to Committee A in that amount.

16. During the interview, Straw Donor #1 provided me with a paper copy of an email that DURAND sent on April 5, 2010 to both Straw Donor #1 and another individual, Straw Donor #2, shortly after Straw Donor #1 made the $4,800 contribution to Committee A. The email from DURAND stated in full:

> I just wanted to thank you both again for helping me out with [Candidate A's] campaign last week. I can't tell you how priceless it is to have friends that I can count on to do something like that, simply PRICELESS.

---

[2] During the interview, Straw Donor #1 was unsure whether the donation was made in her/his name or her/his spouse's name.

>I was hoping for my birthday you will just
>let me forget about paying you
>back...........☺ Just kidding!  I still have
>to make the deposit but I can write you both
>a check or I can get your account numbers and
>do a transfer, whatever works for you.
>
>Thank you, thank you, thank you, thank you

17.  A review of publicly available campaign donation records and subpoenaed bank records reflect both the $4,800 contribution to Committee A associated with Straw Donor #1 as well as DURAND's reimbursement of the donated amount to Straw Donor #1.  Specifically, publicly available campaign contribution records show that on or about March 31, 2010, the spouse of Straw Donor #1 contributed $4,800 to Committee A.  A review of bank records revealed that on or about April 6, 2010, Straw Donor #1 deposited a check for $4,800 into a bank account held jointly by Straw Donor #1 and her/his spouse.  The deposited check was issued by DURAND from her checking account.  I have reviewed the signature card from DURAND's checking account as well as the signature on the $4,800 check issued by DURAND to Straw Donor #1, and, based upon this review, it appears that DURAND signed the check.

18.  On or about June 14, 2012, I, along with a fellow FBI Special Agent, conducted an interview of Straw Donor #2. During this interview, Straw Donor #2 stated that s/he made a $4,800 contribution to Committee A in March 2010 at DURAND's request after DURAND promised to reimburse her/him for the full

$4,800 amount. Straw Donor #2 also stated that s/he would not have made this contribution if DURAND had not promised to reimburse her/him. Straw Donor #2 further stated that DURAND had in fact reimbursed her/him by issuing Straw Donor #2 a check for $4,800 shortly after Straw Donor #2 had made a contribution in that amount.

19. A review of publicly available campaign contribution records and subpoenaed bank records reflect both Straw Donor #2's contribution of $4,800 to Committee A as well as DURAND's reimbursement of the contributed amount to Straw Donor #2. Specifically, publicly available campaign contribution records show that on or about March 31, 2010, Straw Donor #2 and her/his spouse contributed $4,800 to Committee A. A review of bank records revealed that on or about April 8, 2010, Straw Donor #2 deposited a check for $4,800 into a bank account jointly held by Straw Donor #2 and her/his spouse. The deposited check was issued by DURAND from her checking account, and the signature on the check appears to be DURAND's.

20. During a follow-up interview with Straw Donor #2 held in the Eastern District of New York in July 2013, Straw Donor #2 told a fellow FBI Special Agent that in addition to the contribution referenced above, s/he also contributed to Committee B, the congressional campaign committee for another candidate for election to a congressional seat in another district, at DURAND's

urging in 2010. In this instance, however, DURAND provided Straw Donor #2 with funds beforehand, as opposed to reimbursing her/him after the donation to Committee B was made. Specifically, Straw Donor #2 stated that s/he and her/his spouse made a $4,800 contribution to Committee B after DURAND provided her/him with a check for that amount.

21. Bank records I have reviewed reveal that on or about October 20, 2010, a check from DURAND's checking account for $4,800 payable to Straw Donor #2 was deposited into a bank account held in the name of Straw Donor #2 and her/his spouse. I have reviewed this check, and the signature on the check appears to be DURAND's. Bank records also reveal that on or about October 21, 2010, the following day, Straw Donor #2 issued a check for $4,800 payable to Committee B that was drawn on an account held by Straw Donor #2 and her/his spouse.

22. A review of publicly available campaign contribution records and subpoenaed bank records also reflect that DURAND contributed to Committee A through a third individual, Straw Donor #3, a relative of DURAND. Specifically, on or about November 19, 2009, DURAND transferred $1,000 from her Bank of America checking account to a Bank of America checking account held in the name of Straw Donor #3. On the very same day, Straw Donor #3 donated $1,000 to Committee A through the debit card connected to her/his Bank of America checking account.

12

Based upon the circumstances of these transactions, including the fact that DURAND paid Straw Donor #3 the very amount that Straw Donor #3 contributed to Committee A, and that DURAND's payment to Straw Donor #3 occurred on the same day as Straw Donor #3's contribution to Committee A, and based upon my training and experience, I believe that DURAND improperly contributed $1,000 to Committee A in the name of Straw Donor #3.

23. On or about June 14, 2012, I, along with a fellow FBI Special Agent conducted an interview of DURAND. Before starting the interview, we displayed our badges to identify ourselves and during the interview we warned DURAND that making false statements to federal agents constituted a crime.[3/] During the interview, DURAND stated that she was aware of the campaign contribution limits applicable to contributions to Committee A for the 2010 election cycle. DURAND further stated that she was "100 percent certain" that she did not reimburse Straw Donor #2 after Straw Donor #2 contributed to Committee A, and that she "would never pay [Straw Donor #2] back" for making a contribution. With respect to Straw Donor #1, DURAND stated that she did not intend to reimburse Straw Donor #1 at the time she

---

[3/] Several days prior to the interview, I spoke with DURAND by telephone, identified myself as an FBI agent and told her that a fellow agent and I wished to interview her concerning contributions to Committee A and that we wanted to schedule a time to meet. At that time, DURAND and I agreed to meet at DURAND's place of business on the afternoon of June 14, 2012.

13

requested the contribution from her/him, but that several days after Straw Donor #1 made her/his contribution, Straw Donor #1 called DURAND and requested a return of the money s/he had contributed because of the strain the donation placed on her/his family's finances. As a result, DURAND stated, DURAND returned the $4,800 to Straw Donor #1.

24. During a follow-up interview with Straw Donor #1 held in the Eastern District of New York in July 2013, Straw Donor #1 stated to a fellow FBI Special Agent that at no time did s/he request a return of her/his contribution from DURAND because of family financial issues or for any other reason. Rather, Straw Donor #1 stated that DURAND had promised to reimburse Straw Donor #1 at the time DURAND requested that s/he make the contribution, and that after DURAND sent the April 5, 2010 email recounted above, DURAND reimbursed Straw Donor #1 without Straw Donor #1 having to ask DURAND to do so.

### Sealing

25. Because public filing of this document could result in a risk of flight by the defendant, as well as jeopardize the government's ongoing investigation, your affiant respectfully requests that this complaint, as well as any arrest warrant issued in connection with this complaint, be filed under seal.

14

WHEREFORE, your deponent respectfully requests that the defendant DIANA DURAND be dealt with according to law.

```
_____
GEOFFREY FORD
Special Agent
Federal Bureau of Investigation
```

Sworn to before me this
20th day of August, 2013